UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JON M. FESSEL, M.D.                                    CIVIL NO.

    **Plaintiff**

v.

YALE UNIVERSITY HEALTH SERVICES,
ALAN GREENGLASS, PAUL GENECIN,
MORESON KAPLAN, RAVI DRASASULA,
KATHERINE MATZKIN                                     AUGUST 23, 2005

## II. JURISDICTION AND VENUE

1. This action is brought to remedy discrimination on the basis of age and disability, in the terms, conditions, and privileges of employment in violation of The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621-634, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. 12101, *et seq.*, and the Connecticut General Statutes §46a-58(a), §46(a)-60(a)(1), §46a-60(a)(4) and §46a-60(a)(5).

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, §1343(3) and (4), and §1367. Venue is proper within this District based upon 28 U.S.C. §1391(b)(1) and (2). All of the Defendants and the Plaintiff reside in the District of Connecticut and all of the unlawful practices complained of herein occurred within the District of Connecticut.

3.  Plaintiff, Jon M. Fessel, M.D. ("Fessel"), filed a charge of discrimination on the basis of his age and disability, against the Defendants, Yale University Health Services, et al.; ("YUHS") with the Equal Employment Opportunity Commission ("EEOC") and the Connecticut Commission on Human Rights and Opportunities ("CHRO") on or about December 22, 2003, complaining of the acts of age and disability discrimination alleged herein.  On or about May 27, 2005, the CHRO issued a release of jurisdiction and a notice of Right to Sue.  Fessel has complied fully with all administrative prerequisites under the applicable Federal law and Connecticut state law.

### III.  PARTIES

4.  The Plaintiff, Jon M. Fessel,M.D., date of birth October 30, 1936, was at the time of the acts complained of herein, over the age of forty and disabled, a resident of the State of Connecticut, and at all times pertinent herein, he was employed by the Defendant, Yale University Health Services.

5.  The Defendant,  Yale University Health Services ("YUHS"), is the health care provider for students, faculty and employees of Yale University.  YUHS employs approximately 80 physicians and other medical personnel at its facility located in New Haven, Connecticut.

6.  The Defendants, Paul Genecin, M.D., Ravi Dravasula, M.D., Alan Greenglass, M.D., and Moreson Kaplan, M.D. are, respectively, the Director, Medical

Director, Chief of Internal Medicine and Associate Director for Clinical Affairs at YUHS.  Defendant Katherine Matzkin is an employee of Yale University's Human Resources Department.

## IV. NATURE OF CLAIM

7.  This claim seeks restitution to plaintiff of all rights, privileges, benefits, and income that plaintiff would have had but for the defendants' unlawful discriminatory practices.

8.  This claim seeks to recover wages and benefits due plaintiff under his employment contract.

9.  This claim further seeks compensatory damages, liquidated damages and punitive damages for the harm done to the plaintiff.

## V.  STATEMENT OF THE CLAIM

10.  In 1985, plaintiff left his private practice to become Chief of Internal Medicine at YUHS, a position for which YUHS heavily recruited him and provided him with a written employment contract which set forth the terms of his employment with YUHS.

11.  Throughout his tenure with YUHS, he had been the primary physician for many of the most prominent members of the Yale community.

12. Over an extended period of time, most recently on October 21, 2003, the defendants have discriminated against him because of his age, and his disabilities arising from a cardiac arrest he suffered in November 1999 and subsequent major depression.

13. In November 1999, plaintiff suffered a serious cardiac arrest, as a result of which he was deprived of oxygen for a significant period. YUHS, as his health care provider, was responsible for providing care relating to his cardiac arrest and any conditions arising out of that event

14. In addition to the cardiac arrest itself, plaintiff subsequently suffered temporary cognitive impairment and serious depression, conditions that frequently follow a cardiac arrest and which, in his case, were almost certainly the result of his cardiac arrest.

15. By 2002, plaintiff's depression had become severe, and that condition was, or at the very least should have been, known to defendants. Plaintiff has been under the care of Dr. Paul Kirwin, a respected psychiatrist in the New Haven area, since January 16, 2003.

16. Beginning in 1990, YUHS systematically favored younger, much less experienced physicians for senior management positions.

17. Plaintiff was 49 years old when YUHS recruited and hired him to be Chief of Internal Medicine in 1985. The person to whom he reported when he began work at YUHS, the Medical Director John Federico, was approximately 45 years old. Dr.

Federico in turn reported to the Director, Daniel Rowe, who was approximately 60 years old.

18.  In 1990, Dr. Federico, who was then approximately 50, left YUHS and was replaced as Medical Director by Stephanie Spangler, M.D.  Dr. Spangler was approximately 38 years old at the time.

19.  In 1991, when plaintiff was 55, YUHS replaced him as Chief of Internal Medicine with a much younger physician, defendant Genecin, who was then approximately 37 years old.

20.  Also in 1991, Dr. Spangler, who was then 40, was promoted to be the Director of YUHS, and defendant Kaplan, became the Medical Director.

21.  In 1996, Dr. Genecin, then 43 years old, was promoted to Director of YUHS, and David Smith, approximately 42 years old, became Chief of Internal Medicine.

22.  In early 2001, defendant Durvasula, approximately 37 years old, was appointed to be both Medical Director, replacing Dr. Kaplan, and Interim Chief of Internal Medicine, replacing Dr. Smith.  When appointed to these positions, Dr. Dravasula had virtually no experience as a practicing physician.

23.  In January 2002, YUHS hired Tariq Malik, M.D., age 64, to be Chief of Internal Medicine.  Less than three months later, however, YUHS fired Dr. Malik (who, as described below, had refused defendant Dravasula's demands that he terminate plaintiff's employment.)  YUHS subsequently appointed defendant Greenglass, age 53,

to be Interim Chief of Internal Medicine.  Specifically, defendant Dravsula requested to D. Malik that he "ease [plaintiff] out" of his position at YUHS.

24.  In October 2000, on the advice of plaintiff's primary YUHS physician, Robert Henry, M.D. (who has since left YUHS), plaintiff advised YUHS that he would no longer be able to work nights or weekends.  In response, YUHS significantly reduced plaintiff's salary.  Plaintiff protested the decrease in salary, to no avail.

25.  YUHS also deprived plaintiff of needed medical care.  Indeed, after Dr. Henry left YUHS in November 2000, YUHS failed to designate *any* physician to be responsible for plaintiff's care for more than 1 ½ years.

26.  In gross violation of its duties as plaintiff's health care provider, YUHS has never administered a single neurological or psychiatric test to evaluate his mental condition, notwithstanding that it is well known in the medical community that psychiatric disorders, including cognitive impairment and major depression, frequently occur in the aftermath of a cardiac arrest.

27.  As described above, YUHS hired Dr. Malik to be Chief of Internal Medicine in January 2002.  Almost immediately after Dr. Malik assumed his position, defendant Dravasula, who as Medical Director was Dr. Malik's superior, repeatedly demanded that Dr. Malik begin "easing [plaintiff] out."  When Dr. Malik asked Dr. Dravasula the reason for these demands, Dr. Dravasula could provide none.  Dr. Malik accordingly refused Dr. Dravasula's demands.

28.  In early April 2002, approximately 3 months after YUHS had hired Dr. Malik, YUHS summarily fired him.

29.  In June 2002, Dr. Greenglass, who had been with YUHS for only a brief period, had little, if any, opportunity to assess plaintiff's work, gave him a written performance evaluation which gave several unsupportable "Below Average" ratings, including for the quality of patient care, which was blatantly unfounded.

30.  These ratings were directly contrary to a letter plaintiff had received less than a month earlier from the Deputy Director of YUHS, which stated:  (a)  that plaintiff had received nominations from his peers and colleagues as YUHS Physician of the Year, (b) "recognize[d] … the service, team work and patient focus [plaintiff had] demonstrate[d] in [his] work," "and (c) commended plaintiff for his "dedication to high quality, patient focused service."  Indeed, even Dr. Greenglass, who gave plaintiff the evaluation, sought to distance himself from it, telling plaintiff that the rating for patient care was "based on hearsay."

31.  By 2002, plaintiff was suffering from major depression, which became increasingly more severe as 2002 progressed.

32.  During the second week of January 2003, plaintiff sought treatment for his depression from a YHUS psychiatrist, Howard Blue, M.D.  On January 9, 2003, plaintiff asked Dr. Blue's administrative assistant to schedule an appointment for him.  Plaintiff made clear that he was seeking treatment for himself.

33. Dr. Blue left a message for plaintiff later that day saying he would communicate with him the following day.  Dr. Blue did not do so.

34. Dr. Blue's failure to follow-up with plaintiff was yet another violation of medical standards and a knowing failure to accommodate the plaintiff's disability.  It is well understood by mental heath care professionals that people suffering from depression or other psychiatric disorders are often reluctant or unable to seek care; indeed, they may not even understand that they are impaired and need treatment.  Accordingly, not only prompt follow-up but repeated follow-up may be necessary to ensure that patients receive proper care.

35. On January 16, 2003, because of his major depression, plaintiff advised YHUS that he could not come to work.  That same day, plaintiff sought treatment from Dr. Kirwin, who is not affiliated with YUHS.  Plaintiff has been under Dr. Kirwin's care since January 16, 2003.

36. During the week of January 20, 2003, Plaintiff had at least two telephone conversations with defendant Greenglass during which he told Dr. Greenglass that Dr. Kirwin was treating him for depression and that Dr. Kirwin had prescribed a medication, Mirtazapine, for him.  Mirtazapine is frequently prescribed for major depression, as Dr. Greenglass knew or, as a physican, should have known.

37. Late during the week of January 20, 2003, Dr. Greenglass called plaintiff at home and asked him to come to work the following Monday, January 27, 2003.  Dr.

Greenglass told plaintiff that, in view of his condition, rather than see scheduled patients, plaintiff should catch up on paperwork in the morning, meet with Dr. Greenglass and Dr. Dravasula at noon, and then work in YUHS's Urgent Visit Center in the afternoon. The Urgent Visit Center is for patients without appointments who need non-emergency care promptly.

38. As Dr. Greenglass requested, plaintiff went to work on January 27, 2003. At around noon on January 27, 2003, Dr. Greenglass asked plaintiff to meet him in YUHS's Administrative Suite. Finding it odd that Dr. Greenglass had not scheduled the meeting to take place in his own office, plaintiff asked Dr. Greenglass who else would be present. Dr. Greenglass said that it would be he and Dr. Dravasula. In fact, when plaintiff arrived at the Administrative Suite, he found not only Dr. Greenglass and Dr. Dravasula present, but also defendant Matzkin from Human Resources.

39. At the meeting, defendant Greenglass questioned plaintiff about prescriptions that he had written for two patients, Maria Mendizabal and John Bell. Plaintiff was shown copies of prescriptions for Ms. Mendizabal and Mr. Bell and asked whether he had written them. Plaintiff readily acknowledged that he had written them.

40. Ms. Mendizabal was plaintiff's medical assistant. He had written a number of prescriptions for Ms. Mendizabal for medication for migraine headaches, a condition for which others at YUHS had long treated Ms. Mendizabal. Similarly, plaintiff prescribed medication for Mr. Bell's back condition, for which others at YUHS had

treated Mr. Bell.

41. After questioning plaintiff, Dr. Greenglass, Dr. Dravasula and Ms. Matzkin left the room, asking him to remain. When they returned, Ms. Matzkin told plaintiff that he would be fired unless he agreed to resign or retire. Ms. Matzkin asserted that the prescriptions written for Ms. Mendizabal and Mr. Bell had put those individuals "at risk of motor vehicle accident or overdose." Ms. Matzkin further threatened that if he did not resign or retire, the plaintiff and his wife would be deprived of health insurance benefits.

42. The defendants were also grossly negligent both as plaintiff's health care provider and his employer, in that at no time during the meeting did Dr. Greenglass, who knew full well that plaintiff was suffering from a major disability (depression), Dr. Dravasula, who knew or should have known of his disability, or Ms. Matzkin, a trained Human Resources professional, who also knew or should have known of his disability, inquire whether plaintiff was in need of an accommodation or medical care for his disability. Indeed, to this day, defendants have never done so.

43. At all times herein, defendants knew that Ms. Mendizabal had also asked another YUHS physician to prescribe medication for her migraine headaches and that he had done so. That physician, who is substantially younger than the plaintiff, was never threatened with termination, nor disciplined. According to the YUHS website, Ms. Mendizabal also remains employed at YUHS..

44. Plaintiff retained counsel, who on February 4, 2003, informed YUHS that

plaintiff would not resign or retire, that instead he requested to be placed on a disability leave.

45. Plaintiff, through counsel, requested that YUHS preserve all documents concerning YUHS policies relating to prescriptions of medication and all existing prescriptions written by YUHS physicians.

46. In a letter to the plaintiff dated February 24, 2003, defendant Matzkin indicated that YUHS had reconsidered its decision to terminate him and instead issued a "final warning" and provided plaintiff with a memorandum purporting to give a "final warning." Throughout his tenure at YUHS, plaintiff had never previously received any type of disciplinary warning.

47. On April 1, 2003, plaintiff, through counsel, attempted to initiate an internal YUHS grievance process, which has yet to proceed. The plaintiff maintained that the "final warning" simply reiterated the pretextual assertions the defendants had made to plaintiff on January 27, 2003 and was inaccurate in other respects as well.

48. While on his disability leave, defendants have continued to discriminate against plaintiff due to his age and disability, and have retaliated against him for asserting his legal rights.

49. In accordance with its contractual obligations, more fully set forth in an employment contract dated September 5, 1985, between plaintiff and defendant YUHS,

YUHS reappointed plaintiff as a physician every two years.  According to said contract, YUHS is contractually obligated to continue reappointing the plaintiff to his position unless it can demonstrate cause to end his  employment.

50.  Plaintiff was due to be reappointed to his position at YUHS as of July 1, 2003.  Accordingly, in late June 2003, he spoke with Nancy Creel, a Human Resources representative, concerning his reappointment, requesting that she advise him when it would take place.

51.  Having heard nothing in response, plaintiff wrote to defendant Dravasula on October 7, 2003 inquiring about his reappointment, and also enclosing his medical license renewal form.  (YUHS is contractually obligated to renew plaintiff's license at its expense.)  By letter dated October 21, 2003, Dr. Dravasula responded that, pursuant to an asserted YUHS practice, YUHS "took no action" with respect to his re-appointment because he was on disability leave.

52.  Plaintiff discovered that YUHS removed his name from its website list of YUHS physicians prior to the conclusion of his disability leave and posted openings for positions for which he would be more than qualified to fill, which had not been filled when the plaintiff was available to return to work.

53.  Despite the plaintiff's request in April 2004, to return to work upon his doctor's recommendation the defendant has continued its discriminatory treatment and refused to allow him to return to his former position even though it has posted positions

for which the plaintiff would be more than qualified to fill, in breach of its contractual and legal obligation to do so.

54. As a result of the manner in which the plaintiff was treated by the defendants, the plaintiff has suffered and continues to suffer emotional distress.

## VI.  CAUSES OF ACTION

### A.  FIRST CAUSE OF ACTION (as to Defendant YUHS)

56. Plaintiff repeats and realleges each and every allegation contained in paragraphs numbered "1" through "55" of his complaint with the same force and effect as if fully set forth herein.

57. The defendant has discriminated against the plaintiff on the basis of his age by taking adverse actions in his employment against him based upon his age and by treating him differently than his younger counterparts in the terms and conditions of his employment in violation of The Age Discrimination in Employment Act and the Connecticut Human Rights Statutes

58. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of the defendant's purposeful discriminatory practices unless and until this Court grants relief.

### B.  SECOND CAUSE OF ACTION (as to Defendant YUHS)

59.  Plaintiff repeats and realleges each and every allegation contained in paragraphs numbered "1" through "58" of his complaint with the same force and effect as if fully set forth herein.

60.  The defendant has discriminated against the plaintiff based upon his disability by not allowing him reasonable accommodations for his disability and further by treating him differently than others without a disability in the terms and conditions of his employment in violation of The Americans with Disabilities Act of 1990 and the Connecticut Human Rights Statutes.

61.  Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of the defendant's purposeful discriminatory practices unless and until this Court grants relief.

### C.  THIRD CAUSE OF ACTION (as to Defendant YUHS)

62.  Plaintiff repeats and realleges each and every allegation contained in paragraphs numbered "1" through "61" of his complaint with the same full force and effect as if fully set forth herein.

63.  The defendant knowingly materially breached the employment contract which it drafted and entered into with the plaintiff on September 5, 1985, in that it failed to reappoint the plaintiff per the terms of the contract as it was required to do and instead

attempted to terminate the plaintiff without cause.

64. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of the defendant's material breach of the employment contract unless and until this Court grants relief.

### D.  FOURTH CAUSE OF ACTION (as to Defendant YUHS)

65. Plaintiff repeats and realleges each and every allegation contained in paragraphs numbered "1" through "64" of his complaint with the same force and effect as if fully set forth herein.

66. Defendant has breached the Covenant of Good Faith and Fair Dealing inherent in the contract, when it breached the employment contract with the plaintiff, in that, it did not act fairly in not reappointing the plaintiff to his position, as this was a material breach of the employment contract.

67. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendant's breach of the employment contract and the Covenant of Good Faith and Fair Dealing inherent in said contract unless and until this Court grants relief.

### E. FIFTH CAUSE OF ACTION (as to all Defendants)

68.  Plaintiff repeats and realleges each and every allegation contained in paragraphs numbered "1" through "67" of his complaint with the same force and effect as if fully set forth herein.

69.  The defendants have intentionally inflicted emotional distress upon the plaintiff by their outrageous conduct.

70.  Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendants' intentional infliction of emotional distress upon the plaintiff unless and until this Court grants relief.

### F.  SIXTH CAUSE OF ACTION (as to all Defendants)

71.  Plaintiff repeats and realleges each and every allegation contained in paragraphs numbered "1" through "70" of her complaint with the same force and effect as if fully set forth herein.

72.  The defendants' have negligently inflicted emotional distress upon the plaintiff in the termination process.

73.  Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of the defendants' negligence unless and until this Court grants relief.

## VII.  CLAIMS FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this court enter a judgment:

(a) Ordering reinstatement;

(b) Back pay;

( c) Front pay;

(d) Compensation for lost employment benefits.

(e) Punitive and liquidated damages to the extent authorized by law;

(f) Granting such other and further relief as the Court deems necessary and proper.

## VII JURY DEMAND

Plaintiff demands a jury to try all claims triable by jury.

                                        THE PLAINTIFF
                                        JON M. FESSEL, M.D.


                                        By_____
                                           Judith A. Ravel
                                           Judith A. Ravel Attorneys at Law
                                           246 Goose Lane, Suite 246
                                           Guilford, CT 06437
                                           (203) 458-2300
                                           Federal Bar No. CT 07253

F:\General\CLIENT F-J\Fessel\Federal Complaint 08 23 05.wpd