UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JON M. FESSEL, M.D. | : | CIVIL NO.: 3:05 CV 01348 (SRU) |
| Plaintiff | : | |
| V | : | |
| YALE UNIVERSITY HEALTH SERVICES, ALAN GREENGLASS, PAUL GENECIN, MORESON KAPLAN, RAVI DURVASULA, KATHERINE MATZKIN | : : | |
| Defendants | : | APRIL 9, 2008 |

### AFFIDAVIT OF KATHERINE MATZKIN

Katherine Matzkin, being duly sworn, deposes and says:

1.     I am over the age of 18 years and believe in the obligation of an oath.

2.     I make this affidavit of my personal knowledge.

3.     At all times relevant to this action I was employed by Yale University as the Director of Compensation, Placement and Staff Relations.

4.     In January of 2003, I was informed that the Drug Control Division of the State Department of Consumer Protection was conducting an investigation into prescriptions written by Dr. Jon Fessel. Thereafter an investigation was undertaken internally by Yale University Health Services.

**DONAHUE, DURHAM & NOONAN, P.C.**
CONCEPT PARK  •  741 BOSTON POST ROAD
GUILFORD, CONNECTICUT 06437
TEL: (203) 458-9168 • FAX: (203) 458-4424
JURIS NO 415438

5.     The investigation revealed that Dr. Fessel had written several dozen narcotics prescriptions for two individuals with whom he did not have a doctor/patient relationship.  The two individuals were Dr. Fessel's medical assistant, with whom Dr. Fessel never had a doctor/patient relationship,  and a man who was a former patient of Dr. Fessel.  When I questioned  Dr. Fessel on the subject, he  admitted that he had prescribed narcotics to the two individuals without making any documentation in either individual's medical chart. Dr. Fessel had written a total of 14 different prescriptions for the medical assistant and 54 different prescriptions for the former patient at a time when they were not his patients.

6.     At the time Dr. Fessel was prescribing narcotics to the medical assistant, her primary care physician, Dr. Daniel Geisser of the YUHS, was also prescribing narcotic pain medication to her, and he was attempting to wean her off the narcotics, since he believed she was becoming addicted.

7.     Dr. Fessel did not communicate with Dr. Geisser regarding his decision to provide narcotics to Dr. Geisser's patient, nor did he place any notation in the medical assistant's medical chart to indicate that he had prescribed the narcotics for her. Without this information, Dr. Geisser's efforts to wean his patient off addictive narcotics could not be successful.

8.     The other individual was a former patient of YUHS.  During the time that Dr. Fessel was prescribing the narcotic medication for him, he was no longer a patient of Dr. Fessel, nor was he a patient of the YUHS.  By January of 2003, this individual had not been a patient of YUHS for more than two years.

2

10.     On January 27, 2003, I, along with members of the YUHS administration, met with Dr. Fessel to address the concerns that had arisen as a result of his prescription writing practices. Dr. Fessel did not suggest that his actions were due to any disability at that time, or at any other time prior to January 27, 2003.

11.     Dr. Fessel acknowledged during the meeting on January 27, 2003 that he was aware that any prescription for a narcotic medication must be documented in the patient's medical chart. He also admitted that he had failed to document the prescriptions he had written for the medical assistant and for his former patient. Dr. Fessel further stated that he never spoke with the medical assistant's primary care physician, and he did not know that she was already receiving narcotic pain medication from her primary care physician. The primary care physician at that point was Dr. Daniel Geisser, a staff internist at YUHS whose office was several doors away from Dr. Fessel's office at YUHS. Dr. Fessel never communicated with Dr. Geisser about the fact that he was prescribing narcotic medication to one of Dr. Geisser's patients.

12.     The YUHS administration concluded that Dr. Fessel had violated the standard of care expected of physicians at YUHS when he prescribed narcotics for his medical assistant outside the doctor/patient relationship, without ascertaining that there were no contraindications to her taking the medication, without placing a notation in the individual's medical chart, and without communicating with her primary care doctor about the prescriptions. We also concluded that providing 54 prescriptions for the other individual, who was no longer a patient of Dr. Fessel, was a significant deviation from the standard of care expected of YUHS internists.

3

13.     At the conclusion of the meeting on January 27, 2003, Dr. Fessel was informed that he had engaged in serious misconduct, and that he would be terminated unless he agreed to resign or retire. Dr. Fessel was told that he should not make a decision immediately, but that he should think about it. It was also suggested that he contact Yale University's Director of Benefits in order to obtain information on how his benefits would be impacted by the manner in which he terminated his employment with YUHS.

14.     Dr. Fessel indicated that he would consider the matter and get back to the administration.

15.     The next communication from Dr. Fessel came in the form of a letter, dated February 4, 2003, from his lawyer, Attorney Judith Ravel. The letter suggested that Dr. Fessel had a disability, i.e. depression, and sought an accommodation by way of a leave of absence. This was the first notice to YUHS that Dr. Fessel had a disability or that he desired an accommodation. A copy of that letter is attached hereto as Exhibit A.

16.     The University then wrote to Dr. Fessel's lawyer indicating that his request for an accommodation was granted.  Instead of a discharge, he was given a medical leave of absence and the discharge was converted into a final written warning effective January 27, 2003. A copy of that letter is attached hereto as Exhibit B.

17.     Thereafter, Dr. Fessel was sent two different communications informing him that his medical leave of absence, in accordance with the University policy, would expire in one year.  Copies of those letters are attached hereto as Exhibits C and D.  Dr. Fessel never contacted YUHS about returning to work either before or after his medical leave ended.

4

18.     Dr. Fessel did not return to work within one year of the commencement of his leave of absence; in fact, he made no effort to return to YUHS at any time, even up to the present date. As a result, in accordance with University policy, Dr. Fessel was considered to have voluntarily resigned as of February 26, 2004. A copy of the University's policy is attached hereto as Exhibit E.

19.     Dr. Fessel's leave of absence was continued an additional month beyond the normal twelve month limit under University policy for the purpose of permitting him to complete his application for disability insurance benefits. See Exhibit F. Dr. Fessel did not request an additional extension of his medical leave of absence beyond that one month extension.

20.     Neither I nor YUHS discriminated against Dr. Fessel on the basis of his age or disability or for any other reason. Dr. Fessel was not treated any differently than any other employee who took a leave of absence for more than one year.

_____
Katherine Matzkin

Subscribed and sworn to before me this ___9___ day of April, 2008.

_____
Notary Public

My Commission Expires May 31, 2012

5

YALE UNIVERSITY HEALTH SERVICES


By _____/s/_____
               Patrick M. Noonan (ct00189)
               Donahue, Durham & Noonan, P.C.
               741 Boston Post Road
               Guilford, CT 06437
               203-458-9168

## **CERTIFICATION**

     I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

John R. Williams, Esquire
jrw@johnrwilliams.com


                        _____/s/_____
                        Patrick M. Noonan

# EXHIBIT A

Judith A. Ravel

Margot Kenefick Burkle

Lauragene Lyons

J U D I T H   A .   R A V E L
A T T O R N E Y S   A T   L A W

RECEIVED

FEB 0 7 2003

OFFICE OF THE
GENERAL COUNSEL

February 4, 2003

*Via Facsimile and U.S. Mail*

Paul Genecin, MD
Director
Yale University Health Services
17 Hillhouse Avenue
New Haven, CT  06520

Re:  Jon  M. Fessel, M.D.

Dear Dr. Genecin:

I represent Dr. Jon M. Fessel, M.D.  As you undoubtedly know, Dr. Fessel was told last Monday that unless he elected to retire Yale University Health Services ("YUHS") would terminate his employment and deny him and his wife retirement health benefits.  Dr. Fessel has no intention of retiring.  If YUHS discharges Dr. Fessel, we will promptly bring an action seeking damages, including punitive damages and attorneys' fees, for age discrimination, for breach of Dr. Fessel's employment agreement, for violation of the Employee Retirement Income Security Act ("ERISA") and, as described below, possibly other unlawful conduct as well.

On the advice of Dr. Fessel's psychiatrist, Dr. Paul Kirwin, Dr. Fessel is taking leave under the Family and Medical Leave Act ("FMLA").  As Dr. Fessel told Dr. Greenglass at least twice during the week of January 20, 2003, he is being treated for depression, a condition Dr. Kirwin believes may have existed for some time.  I understand that Dr. Kirwin is sending a letter to Dr. Greenglass confirming Dr. Fessel's need for a medical leave.  Dr. Fessel will be using his accumulated sick leave for FMLA purposes, as the FMLA (and YUHS' policy) entitles him to do.  If YUHS denies Dr. Fessel the leave to which he is entitled, or interferes with it in any way, we will bring suit under the FMLA.

Dr. Fessel was told last Monday that the reason for his discharge – should he not retire – would be that prescriptions he wrote for two patients, Maria Mendizabal and John Bell, had put those patients at risk of motor vehicle accident or overdose.  That is untrue and plainly pretextual.  As you know full well, you

Paul Genecin, MD
Page 2
February 4, 2003

and your staff have long been planning to force Dr. Fessel to leave his
employment. You have harassed him in numerous ways, such as decreasing his
compensation while increasing his working hours.

Dr. Fessel has a contractual right not to be terminated except for cause,
and YUHS's asserted reasons for Dr. Fessel's discharge do not constitute cause.
Indeed, the obvious flimsiness of those reasons confirm that they are pretextual.
The medication Dr. Fessel prescribed for Ms. Mendizabal was for migraine
headaches, for which Ms. Mendizabal has long been treated by YUHS. Similarly,
Dr. Fessel prescribed medication for Mr. Bell for a back condition for which he
was treated while under YUHS's care. The assertion that these prescriptions put
Ms. Mendizabal and Mr. Bell at risk is simply unsupportable. I have no doubt
that discovery will show numerous instances of similar prescriptions, and no
disciplinary action in response. In fact, I understand that one YUHS physician,
who is younger than Dr. Fessel, prescribed the same medication for Ms.
Mendizabal in substantially the same quantities as Dr. Fessel did and has not been
terminated or even suspended.

When presenting Dr. Fessel with the choice of retiring or being fired, Ms.
Matzkin threatened that if Dr. Fessel did not retire YUHS would seek to deprive
him and his wife of retirement health benefits to which they are entitled. Dr.
Fessel's rights to those benefits are guaranteed by ERISA, and any interference
with his rights would be a violation of ERISA.

We are also investigating other possible claims, including claims relating
to the adequacy of the medical care YUHS provided to Dr. Fessel after his
coronary in November 1999 (including its failure to conduct any significant
neurological or psychological examination of Dr. Fessel), whether Dr. Fessel's
depression or other mental impairment – of which YUHS, as Dr. Fessel's health
care provider, should have been aware – required reasonable accommodation and
whether YUHS violated federal and state employment discrimination laws by
failing to provide such accommodation.

Paul Genecin, MD
Page 3
February 4, 2003

To be certain there is no misunderstanding, Dr. Fessel intends to bring suit if YUHS proceeds with its announced intention to discharge him.  Accordingly, the University is obligated to preserve all documents and other evidence that may be relevant to the claims outlined above, including but not limited to:   (1) all documents relating to any employment decision concerning Dr. Fessel; (2) all extant records of prescriptions written by YUHS physicians; (3) all documents concerning any YUHS policies relating to prescription of medications, including but not limited to documents concerning the enforcement or lack of enforcement of those policies; (4) all documents relating to any consideration as to whether, or determination that, the University did or did not have cause to terminate any employee; (5) all documents concerning Dr. Fessel's coronary, his subsequent leave, or his return from that leave; (6) all documents concerning care given or not given to Dr. Fessel in connection with his coronary; and (7) all documents concerning the hiring of any person to fill the position of Chief of Internal Medicine after Dr. Fessel.

In addition, Dr. Fessel is entitled to certain documents now.  Dr. Fessel asked Ms. Matzkin for a copy of his personnel file, and Dr. Fessel explicitly requested that he be given copies of any documents relating to any investigation that led to the ultimatum given to him last week.  None were provided.  As Ms. Matzkin should be aware, Connecticut law and YUHS policies give employees the right to access all documents relating to employment decisions affecting them, whether or not such documents are maintained in what the employer designates as a "personnel file."  *See* C.G.S.A. §§ 31-128a, b.  It is very difficult to believe no such documents exist.  Please forward copies to me promptly.

Paul Genecin, MD
Page 4
February 4, 2003

      Finally, the copy of YUHS Personnel Policies and Practices Manual that was given to Dr. Fessel did not include the policies on sick leave. Section 305, Page 30 is missing from the booklet Ms. Matzkin furnished. We request it be sent immediately.

      If you wish to discuss any of the above, please call me at (203) 458-2300.

                    Very truly yours,

                    Judith A. Ravel

cc:    Caroline Hendel, Esq.
       Office of General Counsel
       Yale University

       Dr. Jon M. Fessel

**EXHIBIT B**

# Yale University



*Office of the Vice President*
*and General Counsel*
*P.O. Box 208255*
*New Haven, Connecticut 06520-8255*

*Campus address:*
*Whitney Grove Square*
*2 Whitney Avenue, 6th Floor*
*New Haven, Connecticut 06510*
*Telephone: 203 432-4949*
*Fax: 203 432-7960*

February 25, 2003

Judith A. Ravel, Esq.
246 Goose Lane - Suite 201
Guilford, CYT  06437

Re:  <u>Jon M. Fessel, M.D.</u>

Dear Ms. Ravel:

I write in response to your February 4, 2003 letter regarding Dr. Jon M. Fessel.

The University has neither harassed Dr. Fesel nor treated him unfairly.  His prescribing high quantities of narcotics to individuals who were not his patients violated the standard of care expected of physicians. The University investigated Dr. Fessel's actions after learning of the prescriptions from the Drug Control Division of the State Department of Consumer Protection. Dr. Fessel only raised his medical condition after he violated the procedures and after he was notified of the University's decision to discharge him.  Accordingly, the University has no legal right to accommodate Dr. Fessel's request for reinstatement and a leave of absence.

While under no legal obligation to do so, in recognition of Dr. Fessel's service, the University has decided to convert Dr. Fessel's discharge to a final written warning.  A copy of the letter notifying Dr. Fessel of this decision and a copy of the final written warning are attached.  In addition, on receipt of the appropriate medical documentation, the University will honor Dr. Fessel's request for a leave.

With regard to your request for documents, I understand that you have already been provided with a copy of Dr. Fessel's personnel file; the attached two letters complete that file. Also attached is a copy of page 30 of the Personnel Policies and Procedures Manual, which I understand you did not receive.  Dr. Fessel may request copies of his medical records directly

from YUHS by completing the appropriate form. The University has no obligation to provide you with any of the other records you request.

Sincerely,

Caroline G. Hendel
Associate General Counsel

CGH:tc
Enclosures

**EXHIBIT C**

# Yale University

Department of Human Resources
Placement and Staff Relations

Central Area Mailing Address:
P.O. Box 208256
New Haven, Connecticut 06520-8256

School of Medicine Mailing Address:
P.O. Box 208344
New Haven, Connecticut 06520-8344

Campus address:

Central Area Office:
155 Whitney Avenue
Telephone: 203 432-5700

School of Medicine Office:
155 College Street
Telephone: 203 785-3838

February 24, 2003

Jon M. Fessel, M.D.
246 Catherine Terrace
Fairfield, CT 06430

Dear Dr. Fessel:

I am by this letter notifying you of the decision regarding your status as a physician at the Yale University Health Services.

After careful consideration, YUHS has decided to accommodate your request that you not be discharged, owing to your assertion that your actions resulted from a medical condition. This conclusion has been reached despite the fact that you only informed your supervisors of your medical problem after you were called to account for having prescribed narcotics improperly. Accordingly, your discharge of January 27, 2003, will be converted to a final written warning, as described in the attached letter. Your request for a leave effective January 27, 2003, will be granted as soon as you provide medical documentation to me that you are unable to work as a result of this illness.

If on leave and pursuant to University policy, your job will be held until no later than January 26, 2004. Monthly notes will be required from your provider confirming your continued inability to work as a result of illness. They must be sent to my attention at P.O. Box 208256, New Haven, CT 06520-8256. You may use your accrued sick and vacation pay during your leave. Questions concerning benefits during a leave should be directed to Nancy Creel.

When you are ready to return, YUHS will require medical certification of your fitness to return to duty. In addition, your work, including your prescriptions of narcotics, will be under the close supervision of the Chief of the Department of Internal Medicine, or his designee.

If you have questions concerning this letter, please contact me at 432-5703.

Sincerely,

Katherine F. Matzkin
Director of Compensation, Placement and Staff Relations

# Yale University Health Services

17 Hillhouse Avenue
P. O. Box 208237
New Haven, Connecticut 06520-8237

To:     Mike Fessel, MD

From:   Alan Greenglass, MD, Chief, Internal Medicine

CC:     Nancy Creel, YUHS Human Resources

Date:   2/24/03

Re:     Final Written Warning

---

This letter constitutes a final written warning issued as a result of your unacceptable job performance as a physician at the Yale University Health Services. On a routine and regular basis between July 2000 and December 2002, you failed to follow appropriate medical care standards, standards that you acknowledge knowing and understanding. You purposefully prescribed narcotics for two individuals who you acknowledge were not your patients. You failed to properly document these prescriptions, and failed to take any reasonable measures to ensure the prescriptions were not resulting in over-prescription of narcotics.

With respect to your actions taken for your co-worker, on at least 14 occasions between July 3, 2002 and December 12, 2002, you failed to follow 5 medically acceptable standards which you acknowledge knowing and understanding. (1) You prescribed a narcotic, Vicodin, in amounts of 100 units per prescription, for an individual working as your medical assistant, with whom you acknowledge there is no doctor/patient relationship. Such an amount of this narcotic is at the upper level of appropriate medical care. (2) At no time did you check her medical record to determine if her regular physician was also prescribing medications that would contraindicate any further medication. (3) At no time did you ask the individual if she was taking any medication prescribed by others. (4) At no time did you attempt to apprise her treating physician of your prescription writing or seek his advice, even though he worked in the same office area. (5) On all 14 occasions when you prescribed the medication Vicodin, you did not note the prescription in her chart, as is required by university procedure and state health department regulation.

On at least 54 occasions between September, 2000 and January 13, 2003, you prescribed two narcotics, Roxicet and Percocet, for another individual who was then no longer your patient, nor a member of the Yale Health Plan. In total, the quantity of pills was 2,123. You wrote these prescriptions without the benefit of any medical examination and in fact wrote them when he would "stop by."

By your actions you placed two individuals at risk for overdose of narcotics, which could have resulted in a medically dangerous situation for themselves and impaired judgment and/or delayed physical response that could result in risk to others. By your actions you placed Yale University in a highly vulnerable position for lawsuit, embarrassment and customer loss of confidence in the quality of Health Plan care.

As a result of your actions, when you return to work, your prescription of narcotics will be under my direct supervision or that of my designee.

Any further unacceptable performance will lead to further discipline, up to and including discharge.

# CONFIDENTIAL

EXHIBIT D

# Yale University Health Services

17 Hillhouse Avenue
P. O. Box 208237
New Haven, Connecticut 06520-8237

January 5, 2004

J. Michael Fessel, M.D.
246 Catherine Terrace
Fairfield, CT  06430

Dear Dr. Fessel:

I write to remind you that your leave of absence will end on January 26, 2004.  As required by University policy, it is expected that you will contact us at least two weeks prior to that date so that we can determine whether or not you will be returning from your leave of absence.   As you are aware, your position will be held until that date. After such time, you will be considered to have voluntarily resigned.

If you will be returning from your leave, we will need information from your clinician that you are able to perform all of your job responsibilities without limitation.  We may also require an examination.  The information from your clinician may be directed to Eileen Dubois, your Human Resources Representative.   Your clinician may fax this information directly to Eileen at (203) 432-6914.  Please have your clinician's office call (203) 432-5702 before faxing to ensure confidentiality.

If you are unable to return from your leave and require assistance in determining other University options available to you, Eileen is also a resource.  Please do not hesitate to contact her at 432-5702.

Please let me know as soon as possible what your plans are.  I look forward to hearing from you.

Regards,

Nancy Creel
Assistant Director for Administrative Services

Cc:    Eileen Dubois, Central Human Resources
       Alan Greenglass, M.D., Chief, Internal Medicine

# EXHIBIT E

Yale University
Department of Human Resources

# Personnel Policies and Practices Manual

November 15, 1993

## 405   DISABILITY LEAVE

Xref: PPP 400

### 405.1   Definition of Disability Leave

A disability leave of absence will be granted for non-job-related illness or injury, or for disability related to pregnancy and childbirth. Absences due to a work-related disability are covered by Workers' Compensation policies and procedures. For a prolonged period of disability the staff member may be eligible for long-term disability benefits.

Xref: PPP 305.6, 308

### 405.2   Duration of Disability Leave

*Pregnancy and Childbirth Disability.*   The normal period of pregnancy and childbirth disability is considered to be eight weeks: two weeks before delivery and six weeks afterwards. For disability leaves of longer duration, a physician's statement is required.

*Disability for Non-Job-Related Illness or Injury.*   A disability leave for non-job-related illness or injury shall not extend beyond 52 weeks including any continuous sick days taken immediately prior to the leave. Exceptions to this limit for unusual circumstances must be approved by the Director of Personnel Services or the Director of Human Resources for the School of Medicine.

A physician's statement is required prior to the granting of a disability leave. The length of the leave granted may depend upon physicians' statements as to the employee's condition and the ability of the department to hold the employee's job open.

An employee may use accumulated vacation, personal, or sick days at the commencement of the leave.

### 405.3   Benefits During Disability Leave

The University will continue to pay its share of health and non-contributory life insurance premium costs for employees during the first six months of disability leave. An employee who makes any contribution to insurance coverage must make arrangements with the Benefits Office to continue coverage.

Further, an employee on disability leave of absence:

*   accrues vacation and sick days for use after the employee has returned to a regular position, scheduled at 20 hours or more per week; at least 30 calendar days must elapse after return before such time can be used

*   is eligible for pay for any holidays or recess days that occur within any paid portion of the leave

*   is not eligible for tuition assistance

### 405.4   Return From Disability Leave

The returning employee must confirm his or her intention to return by informing the department supervisor at least two weeks prior to the end of the leave.

Upon return from a disability leave for non-job-related illness or injury, the University

may require medical certification or an examination by the University Health Services to be certain that the employee's health permits safe return to work.

### 405.5  Termination

An employee who accepts employment elsewhere, except as approved by the University in advance of the leave, applies for Unemployment Compensation in Connecticut or any other state, or fails to return to work on the date agreed upon, is considered to have voluntarily resigned.

## 406  CAREGIVER LEAVE

### 406.1  Definition of a Caregiver Leave

A caregiver leave is a voluntary unpaid leave of absence to care for a seriously ill relative. Serious illness is considered to be a disabling physical or mental condition that requires inpatient care in a hospital or licensed nursing facility, or outpatient care requiring continuing treatment or supervision by a licensed health care provider. Relative will include:



- spouse

- parent (natural, foster, adoptive, stepparent or legal guardian) of the employee or the employee's spouse

- child (natural, adopted, foster, stepchild, or legal ward) who is under 18 years of age or, if older, unable to care for him/herself because of a serious illness.

A caregiver leave will be granted to the requesting employee, subject to the provisions of this Section and those included in Section 400 of this Manual.

Xref: PPP 400

### 406.2  Duration of a Caregiver Leave

As delineated by federal and state law concerning family and medical leave, a caregiver leave of absence will be limited to 16 calendar weeks in year one and 12 weeks in year two in any two-year period, less any leave of absence time taken within that same period for child-rearing or disability (see Sections 404 and 405). The two-year period will commence on the first day of any leave of absence for child-rearing, disability, or caregiving occurring subsequent to the effective date of this policy.

An employee may use accumulated vacation days or personal days at the commencement of the leave, but in no event can the total absence for caregiver leave exceed the time periods described in the previous paragraph.

Except in cases of emergency, two weeks advance notice is required for a caregiver leave. Requests for a caregiver leave shall be accompanied by a written notice from the physician or other licensed health care provider, verifying the need for a leave and the probable duration.

Xref: PPP 404; 405

**EXHIBIT F**

# Yale University Health Services

January 29, 2004

17 Hillhouse Avenue
P. O. Box 208237
New Haven, Connecticut 06520-8237

J Michael Fessel, MD
246 Catherine Terrace
Fairfield, CT 06430

Dear Dr. Fessel

I am writing to confirm the extension of your leave of absence. Your leave of absence has been extended from an end date of January 26, 2004 to February 26, 2004.

The extension has been made only for the purpose of allowing you to finalize the application with all relevant documentation required by the long term disability insurance carrier.

Please let me know as soon as you have information on your progress. If in the interim, you have questions or concerns, please contact me. Darlene Evans, University Benefits Office and Eileen Dubois, Central Human Resources are also resources.

Regards,

Nancy Creel
Assistant Director, Administrative Services

C:    Darlene Evans, Yale University Benefits Office
      Eileen Dubois, Yale University