UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JON M. FESSEL, M.D. | : | CIVIL NO.:  3:05 CV 01348 (SRU) |
| Plaintiff | : | |
| V | : | |
| YALE UNIVERSITY HEALTH SERVICES, ALAN GREENGLASS, PAUL GENECIN, MORESON KAPLAN, RAVI DURVASULA, KATHERINE MATZKIN | : : | |
| Defendants | : | AUGUST 14, 2008 |

**DEFENDANTS' REPLY TO THE PLAINTIFF'S BRIEF
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

The defendants hereby reply to the plaintiff's Brief in Opposition to Motion for Summary Judgment.

The plaintiff recites a factual background that is inaccurate on significant points. In his statement of material facts, the plaintiff represents that the Connecticut Commission on Human Rights and Opportunities ("CHRO") "concluded that there is a legitimate factual basis for the plaintiff's claim that he has been the victim of age and disability discrimination perpetrated by the defendants." (Pl.'s State. of Material Facts, at ¶ 1.) The plaintiff references the Merit Assessment Reviews as support for this statement. In fact, as the documents attached to the plaintiff's brief themselves indicate, the Merit Assessment Review of any complaint specifically does not include a review of any of the facts. Rather, the

**DONAHUE, DURHAM & NOONAN, P.C.**
CONCEPT PARK  •  741 BOSTON POST ROAD
GUILFORD, CONNECTICUT 06437
TEL:  (203) 458-9168 • FAX: (203) 458-4424
JURIS NO  415438

review is limited to the following determinations: (1) whether the complaint fails to state a claim for relief; (2) whether the complaint is frivolous on its face; (3) whether the respondent was exempt from the Fair Employment Practices Act; and (4) whether there is "no reasonable possibility that investigating the complaint will result in a finding of reasonable cause." Rather than reaching a conclusion that there was "a legitimate factual basis" for the plaintiff's claim, the decision not to dismiss the case at that time simply acknowledged that the complaint was not frivolous on its face. This, of course, is not the standard to be applied by this Court on a motion for summary judgment. Following its decision to retain jurisdiction, CHRO conducted a fact finding, where the evidence did not favor the complainant. After that hearing, and before CHRO could issue a decision unfavorable to the plaintiff, the plaintiff elected to request that CHRO release jurisdiction so that he could file this action. Thus, the CHRO never concluded that the plaintiff had a legitimate factual basis for his claims.

The plaintiff also claims that he was targeted for termination for several years because of his age. (Pl.'s Br. in Opposition to Mot. for S.J., at p. 9.) Contrary to this allegation, the plaintiff was never terminated and did not receive any other disciplinary action until after the state investigators informed the defendants of the plaintiff's improper prescription writing practices. As the plaintiff's own brief concedes, he never received any kind of warning before the final warning issued when the defendants granted the plaintiff's request for a medical leave of absence. (Pl.'s Br. in Opposition to Mot. for S.J., at p. 9.) In fact, the plaintiff acknowledges that any attempt to "ease the plaintiff out of his job" was ignored by

the administration.  (Pl.'s Br. in Opposition to Mot. for S.J., at p. 6.)  Thus, the claim that he was "targeted for several years" is simply without any factual support.

Plaintiff's counsel asserts that the defendants were aware as early as 2002 that the plaintiff suffered from severe depression.  (Pl.'s Br. in Opposition to Mot. for S.J., at p. 6.)  In his deposition, however, the plaintiff admitted that he did not inform the defendants of his depression until the week of January 20, 2003.  (Depo. Jon M. Fessel June 28, 2007 at p. 105.)[1]  Indeed, it was not until the day after he was questioned by the drug control agents that Dr. Fessel decided he was depressed and needed psychiatric treatment.  (Depo. Jon M. Fessel June 28, 2007, at p. 29.)   Additionally, plaintiff's response to the motion for summary judgment fails to include any medical record from YUHS suggesting either that (1) Dr. Fessel was suffering from depression or (2) that he claimed that the improprieties in his prescription writing practices were the result of his depression.  In fact, as noted in defendants' opening brief, that claim was first made by plaintiff's counsel in a letter dated February 4, 2003, after Dr. Fessel was given the option of resigning or being terminated.  In response to that claim by Dr. Fessel, the University permitted Dr. Fessel to go on medical leave and rescinded the termination.

Even if Dr. Fessel had any evidence to suggest that his physicians were aware of his alleged depression, that would not be evidence that the defendants were aware of the plaintiff's medical condition.  None of the individuals involved in making the decisions with

---

[1] Relevant portions of the plaintiff's deposition are attached hereto as Exhibit A

regard to the plaintiff's employment ever provided medical treatment to the plaintiff; and none of the plaintiff's healthcare providers informed the plaintiff's supervisors of his medical condition. Of course to do so would have violated the plaintiff's right to confidentiality. Thus, the fact that the plaintiff received medical treatment from YUHS following his cardiac arrest does not provide evidence that the defendants were aware of the plaintiff's medical condition, even if there were any evidence of him suffering from depression at that time. The plaintiff also claims that the defendants "knew that his failure to record the prescriptions in two locations, rather than one as he did, was the direct result of his disabling depression." (Pl.'s Br. in Opposition to Mot. for S.J., at p. 9.) Of course, since the plaintiff never informed the defendants that he suffered from depression until the week of January 20, 2003, the defendants could not possibly have known that the plaintiff claimed that his failure to properly record the prescriptions over the previous months was the result of his depression.

The plaintiff asserts that he was not investigated by state regulatory authorities. (Pl.'s Br. in Opposition to Mot. for S.J., at p. 8.) In his deposition, however, the plaintiff acknowledged that two agents from the state department questioned him about prescriptions that he had written for his medical assistant and for a former patient. (Depo. Jon M. Fessel June 28, 2007, at pp. 29-30.) In addition, the investigators informed the defendant that the plaintiff's prescription writing practices were improper. See, Matzkin Affidavit dated April 9, 2008, at ¶ 5. The plaintiff also complains that the defendants never took any disciplinary action against the other physician, Daniel Geisser, M.D., who prescribed narcotic medication for the plaintiff's medical assistant. (Pl.'s Br. in Opposition to Mot. for S.J., at p. 9.) Dr.

Geisser was the medical assistant's primary care physician, and it was appropriate for him to prescribe medication for his patient. There is no evidence to suggest that Dr. Geisser's prescription writing practices were out of the ordinary. The plaintiff, on the other hand, was not responsible for the medical assistant's medical care. The plaintiff gave the medical assistant approximately twelve prescriptions for Vicodin, a narcotic, without first seeing her in an office visit or informing her primary care physician of the prescriptions. (Depo. Jon M. Fessel June 28, 2007, at pp. 32-34, 45, 53.) Dr. Fessel himself admitted that he should have noted in the medical assistant's chart that he was prescribing narcotic medication for her and that it would have assisted Dr. Geisser in managing his patient's care had Dr. Fessel done that. (Depo. Jon M. Fessel June 28, 2007, at pp. 50, 117.)

The first time that the plaintiff requested an accommodation was through his lawyer, Attorney Ravel, on February 4, 2003. (Depo. of Jon M. Fessel June 28, 2007, at pp. 104, 107.) The law is clear that a plaintiff must request an accommodation; the defendants need not offer one. See, Graves v. Finch Pruyn & Co., 457 F.3d 181, 184-85 (2d Cir. 2006); Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 120 (2d Cir. 2004). Once the plaintiff requested an accommodation, the defendants granted the plaintiff a one year medical leave of absence. (Depo. Jon M. Fessel June 28, 2007, at p. 107.) The plaintiff was terminated because he failed to return to work after the expiration of his one year medical leave, which was in accordance with YUHS policy. The plaintiff received a letter from the defendants indicating that his medical leave would end on January 26, 2004 and he needed to return to work at that time in order to retain his position at YUHS. His medical leave was then

5

extended for an additional month to enable him to complete his application for disability benefits. <u>See</u>, Matzkin Affidavit dated April 9, 2008, at ¶ 19. However, the plaintiff was simply not ready to return to work at that time. (Depo. Jon M. Fessel June 28, 2008, at pp. 81-83.) Since the plaintiff did not return to work after his one year of medical leave, he was terminated in accordance with YUHS policy. <u>See</u>, Exhibit E to the Matzkin affidavit dated April 9, 2008. Compliance with neutral employment policies does not give rise to an inference of discrimination. <u>Lambert v. Genesee Hosp.</u>, 10 F.3d 46, 58 (2d Cir. 1993); <u>Mars v. Service Now For Adult Persons (S.N.A.P.)</u>, 305 F.Supp.2d 207, 214 (E.D.N.Y. 2004.); <u>Jackson v. Nor Loch Manor HCF</u>, 134 Fed.Appx. 477, 478 (2d Cir. 2005) (Summary Order). Since the defendants terminated the plaintiff because he never returned to work following the expiration of his one year medical leave, the plaintiff cannot prove his claims of age and disability discrimination and the defendants' motion for summary judgment should be granted.

> THE DEFENDANTS,
> YALE UNIVERSITY HEALTH
> SERVICES, ALAN GREENGLASS,
> PAUL GENECIN, MORESON KAPLAN,
> and KATHERINE MATZKIN,
>
> By _____
> PATRICK M. NOONAN (ct00189)
> DONAHUE, DURHAM & NOONAN, P.C.
> 741 Boston Post Road, Suite 306
> Guilford, CT 06437
> (203) 458-9168
> pnoonan@ddnctlaw.com

## **CERTIFICATION**

I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

John R. Williams, Esquire
jrw@johnrwilliams.com

PATRICK M. NOONAN

# EXHIBIT A

1   UNITED STATES DISTRICT COURT

2   DISTRICT OF CONNECTICUT                    COPY

3

4   CIVIL NO.:  3:05 CV 01348 (SRU)

5   JUNE 28, 2007

6   -------------------------------------

7   JON M. FESSEL, M.D.,

8                          Plaintiff

9                      -vs-

10  YALE UNIVERSITY HEALTH
    SERVICES, ALAN GREENGLASS,
11  PAUL GENECIN, MORESON KAPLAN,
    RAVI DURVASULA, KATHERINE MATZKIN,
12                          Defendant

13  -------------------------------------

14

15            DEPOSITION OF JON M. FESSEL, M.D.

16  APPEARANCES:

17          JUDITH A. RAVEL, ATTORNEY-AT-LAW
               Attorneys for the Plaintiff
18             246 Goose Lane, Suite 246
               Guilford, Connecticut  06437
19             (203) 458-2300
            BY:   MARGOT BURKLE, ATTORNEY-AT-LAW
20
            DONAHUE, DURHAM & NOONAN, P.C.
21             Attorneys for the Defendant
               741 Boston Post Road
22             Guilford, Connecticut  06437
               (203) 458-9168
23          BY:  PATRICK M. NOONAN, ESQUIRE

24

25

                    DEL VECCHIO REPORTING
                       (203) 245-9583

1    Q    Was there any other event that occurred in

2  January of 2003 that caused you any distress?

3    A    Yes.

4    Q    And what was that?

5    A    I had a conversation with two men who were DEA

6  investigators.

7    Q    Herb Strickland and Barry Serretto?

8    A    Strickland is correct, I don't know the other

9  name.

10    Q    Okay.  And do you recall when?

11    A    I never did.

12    Q    I'm sorry.  Do you recall when in January that

13  conversation took place?

14    A    It would have been noon on the 15th.

15    Q    And so, you talked with them the day before you

16  decided to seek treatment with Dr. Kirwin, is that right?

17    A    That's correct.

18    Q    Was that, do you think that event, being

19  confronted by the two investigators from the state, did that

20  at all contribute to your decision to seek psychiatric care

21  at that point?

22    A    That's hard to answer.  I think it was one of a

23  series of cumulative blows.  It was part of that.

24    Q    Okay.  It was the last of the cumulative blows?

25    A    The last of the cumulative blows, but I did not

1    seek psychiatric help.   I didn't know what I needed.

2        Q       Until you talked?

3        A       Until I talked to my family.

4        Q       Right.

5        A       Who, even at that point, there was a question

6    about that.

7        Q       Okay.   What happened during this meeting that

8    you had with the two investigators from the state?

9        A       Not much.

10       Q       What do you remember being said?

11       A       It was -- and I don't know much about it.   What

12   I recall is that we met in a conference room, they asked me

13   whether I had written a series of prescriptions for Maria

14   Mendazabel, which I obviously had because it was my

15   signature on the prescriptions, I said yes.   They asked me

16   whether there was, I don't remember the words, but whether

17   there was some unusual relationship between me and Miss

18   Mendazabel, and I said no, and then they said, well, we'd

19   better talk to her, and that's the last I know of the

20   investigation.

21       Q       Okay.   So, that's all you remember talking with

22   those two gentlemen about?

23       A       (Indicating yes.)

24       Q       You don't remember anything else about that

25   conversation other than that respect?

 1      Q      Okay.  Did you ever act as the primary care

 2   physician for Maria Mendazabel?

 3      A      I thought so.

 4      Q      When you are the primary care physician, the

 5   patient designates you by some writing with the Health Plan,

 6   is that right?

 7      A      Within the Health Plan system, that's right.

 8      Q      Did Maria Mendazabel execute such a form listing

 9   you as her primary care physician?

10      A      I have no idea.  I have actually no idea whether

11   anybody has.  I never see that.

12      Q      Okay.

13      A      People appear on your schedule.

14      Q      And did you have, you said that you saw Maria

15   Mendazabel in an urgent visit, did you also see her on

16   regularly scheduled visits?

17      A      I did not.

18      Q      And did -- were you ever aware that she had a

19   primary care physician other than yourself?

20      A      During this time frame, I was not.

21      Q      Okay.  At what point did you know that she had a

22   primary care physician other than yourself?

23      A      Approximately two weeks after -- let me rephrase

24   that.

25             I knew at the meeting with Mr. Strickland that

                      DEL VECCHIO REPORTING
                         (203) 245-9583

1    someone else had written prescriptions for her.  I knew who

2    that person was approximately two or three weeks into

3    February when Dr. Solomon called me in the evening to ask

4    how I was and told me who that was.

5         Q     And who was that?

6         A     Daniel Geisser.

7         Q     Are you saying that prior to the time you went

8    out on a medical leave in January of 2003, you were never

9    aware that Maria Mendazabel had Dan Geisser as her primary

10   care physician?

11        A     I don't know whether I ever knew that.  I was

12   completely unaware that she was -- if she was seeing him

13   during the six to nine months before I left.

14        Q     And how many prescriptions did you write for

15   Maria Mendazabel?

16        A     I don't know.

17        Q     If --

18        A     I think it was something on the order of ten to

19   12.

20        Q     And when you write -- and these prescriptions

21   were for what?

22        A     Vicodin.

23        Q     And that's a class II narcotic?

24        A     I don't know the class precisely.  I'm sorry.

25        Q     But it is a narcotic?

1      A      It's a narcotic, yes.

2      Q      Are there any regulations regarding how you are

3   supposed to keep track of narcotics that you are writing for

4   your patients?

5      A      They certainly should be recorded.

6      Q      Okay.  Should they be mentioned in the patient's

7   chart?

8      A      I'm not sure of that.

9      Q      Well --

10     A      The -- I'm aware of a large number of

11   circumstances in which people renew prescriptions for

12   narcotics without recording them in the chart, but record

13   them other places, like in the duplicate narcotics pad which

14   I did or in a separate narcotics book, it depends on what

15   the practice does.

16     Q      Okay.  Let me ask you about --

17     A      I do not know nor have I ever seen regulations

18   about writing, recording narcotics at Yale Health Plan until

19   I saw a policy promulgated in December of 2002 when we got

20   discovery relative to this case.

21     Q      So, what you -- you looked at a policy at the

22   Yale Health Plan relating to making a record of narcotic

23   prescriptions in the patient's chart that was promulgated in

24   December of 2002?

25     A      It was -- my recollection was that it was

1  gave Miss Mendazabel a prescription for oral narcotics, were

2  they all situations where she came to see you in urgent

3  visit?

4      A    No.

5      Q    Okay.  And what occasions did you have to write

6  prescriptions other than the urgent visit?

7      A    There would have been occasions in the

8  department of medicine where she asked me to renew her

9  prescription.

10     Q    And was this in the context of her coming to

11 visit you in a scheduled visit?

12     A    This is the context of, I have this prescription

13 standing in front of my desk, would you refill my

14 prescription?

15     Q    This is not a patient visit then, it's just, she

16 happens to be in the Health Plan at the same time as you

17 are, is that right?

18     A    Well, she was my medical assistant, she was with

19 me all day every day.

20     Q    She was your medical assistant?

21     A    She was my medical assistant.

22     Q    I knew she worked at the Health Plan, I didn't

23 know she worked with you.

24     A    Well, she was the medical assistant of several

25 people.

1 because of a phone call.

2     Q     But I don't care how you know it, you do know it

3 today?

4     A     Well, if that's correct, I know that.

5     Q     Okay.

6     A     I do not know that from Dr. Geisser nor from

7 examination of the chart.

8     Q     Right. Because you didn't look at the chart?

9     A     No, talking about since January of 2007, I have

10 not had access to any charts at any time.

11     Q     You mean January of 2003?

12     A     January of 2003, I do mean that.

13     Q     But would you agree that in retrospect, it would

14 have assisted Dr. Geisser in managing Miss Mendazabel's care

15 if you had made a note in the chart when you were

16 prescribing medication for a patient he was treating?

17     A     Yes.

18     Q     And you do know now that he was her primary care

19 physician, right?

20     A     In the manner in which I said I know, I know.

21     Q     When did you first become aware that Dr. Geisser

22 was Miss Mendazabel's primary care physician?

23     A     I've already answered this question. But the

24 answer to the question is I became aware of that

25 approximately three weeks after I left Yale Health Plan when

1        A        I did not.

2        Q        As far as you could recall, you didn't look at

3   her chart to find out?

4        A        That's correct.

5        Q        And you didn't talk with any doctor to alert

6   that doctor that you were going to be giving her narcotic

7   medication?

8        A        That's correct.

9        Q        Do you think that your relationship with her as

10  a -- someone who worked with you caused you to relax some of

11  the standards that you normally would apply to this type of

12  situation?

13       A        I think that you have asked several questions

14  about things that I might have done, which I probably didn't

15  do because I had a remarkably trusting relationship with

16  this person on a day-to-day basis.  It's a little... period.

17       Q        It's a little what?

18       A        There is no sentence there.  I had a remarkably

19  trusting relationship with her and it's -- the sentence is,

20  it's somewhat difficult to go from a trusting relationship

21  of that sort to highly questioning.

22       Q        I'm sorry, to what?

23       A        To highly questioning.

24       Q        Well --

25       A        For example, can we get off the record?  No.

                        DEL VECCHIO REPORTING
                           (203) 245-9583

1    but you weren't sure when?

2         A      I'm not aware of that, no.

3         Q      Were you aware of the policy and procedure

4    manual at Yale University?

5         A      (Pause.)

6         Q      I believe it's called the M & P manual?

7         A      I became aware of it, I wasn't -- I became aware

8    of it in February of 2003.

9         Q      How did you become aware of it then?

10        A      Judith Ravel asked for a copy of it.

11        Q      I take it that you got it?

12        A      Exactly.

13        Q      Did you look at it at that time?

14        A      I don't have a recollection of that.

15        Q      Did you become aware at any time of the policy

16   which indicated that a job would be held open for an

17   employee on leave of absence for one year, but not longer?

18        A      I believe that there is a note to that effect in

19   a letter from Katherine Matzkin, the date of which I cannot

20   tell you.

21        Q      And do you remember whether that provision is

22   also contained in the M & P manual?

23        A      I don't know that.

24        Q      And once the one year period was up, you were

25   not yet ready to return to work, from a medical standpoint,

1   is that right?

2       A       That's true.

3               MR. NOONAN:   Let me mark this as the next

4           exhibit.

5               (Whereupon, three letters were marked

6           as Defendant's Exhibits 2, 3 and 4 for

7           identification.)

8   BY MR. NOONAN:

9       Q       Let me show you what we have mark as Defendant's

10  Exhibit 2, it is a letter to you dated February 24, 2003,

11  and it's signed by Katherine Matzkin.   Is that the letter

12  that you were referring to when you said you got a letter

13  informing you that your leave of absence could not extend

14  longer than a year?

15      A       Can we stop?   I would like to go to the men's

16  room.

17      Q       Okay.

18      A       Then I'll come back and read this, absolutely.

19              (Whereupon, there was a short recess.)

20  BY MR. NOONAN:

21      Q       I think when we broke, I was asking you about

22  Exhibit 2, Doctor.

23      A       I was going to read it, and I don't know what

24  the question was.

25      Q       The question that I think I asked or if I

1   didn't, I will ask is:  Exhibit 2, the letter that you

2   referenced before, where you said that Katherine Matzkin had

3   written a letter indicating that the leave of absence that

4   you were taking could extend no longer than a year?

5        A      It is.

6        Q      Okay.  And then Exhibit 3 is a letter dated

7   January 5, 2004 from Nancy Creel, and would I be correct in

8   summarizing it as indicating that you would need to return

9   to work no later than January 26, 2004, in order to keep

10  your position in accordance with university policy?

11       A      That's what it says.

12       Q      And then Nancy Creel wrote you another letter,

13  which we have marked as Exhibit 4, dated January 29, 2004

14  indicating that your position would be held for another

15  month up through February 26, 2004, is that right?

16       A      That's right.

17       Q      And with regard to all three of these exhibits,

18  Exhibits 2, 3, and 4, did you actually receive these

19  letters?

20       A      I believe I have copies of all of these.

21       Q      And you simply were not ready to go back to work

22  as of February 26, 2004, is that right?

23       A      That's correct.

24       Q      So, that as of February 26, 2004, your -- you

25  were regarded as having left your position, in accordance

1           as Defendant's Exhibit 6 for identification.)

2    BY MR. NOONAN:

3        Q      Showing you Exhibit 6, that's a letter from

4    Attorney Ravel to Dr. Genecin at the Yale Health Plan, dated

5    February 4, 2003.  To the best of your knowledge, is that

6    the letter that was sent in response to the options you were

7    given on January 27, 2003?

8        A      It is.  It is.

9        Q      And there is a reference in there, I think, to a

10   request for accommodation because of your disability, do you

11   see that?

12       A      No.

13       Q      Let me see if I could find it.  I know it's a

14   multi-page letter.  Actually, it's more specific than that.

15   In the first page, it states that you were being treated for

16   depression and that Dr. Kirwin would be sending a letter to

17   Dr. Greenglass confirming that you needed a medical leave

18   and that you would be taking a leave pursuant to the family

19   medical leave act.  Do you see that on page one?

20       A      Yes.

21       Q      To the best of your knowledge, is that letter

22   the first time that you or anyone on your behalf notified

23   anyone at the university that you were suffering from

24   depression?

25       A      It is not the first time.

1    Q    When was the first time that you notified

2    anyone?

3    A    During the week prior to the meeting of

4    January 27th, which is a Monday, I had multiple

5    conversations with Dr. Greenglass, I told Dr. Greenglass why

6    I was not coming to work, which he already knows, the chief

7    of medicine told him what I was being treated for and what I

8    was being treated with, Dr. Greenglass knew unequivocally

9    that I was being treated for depression between the 16th of

10   January and the 27th.  So, this is not the first notice.

11   Q    Was your conversation with Dr. Greenglass during

12   the week of January 20th the first time you told anyone at

13   Yale that you were suffering from depression?

14   A    Yes.

15   Q    At any time prior to January 20, did you request

16   any accommodation for a disability?

17   A    No.

18   Q    Okay.  And did you ever request any

19   accommodation for a disability?

20   A    I never got there.

21   Q    I just want to find out if you ever requested

22   it.

23   A    No.  I expected to at the 27th meeting, but it

24   wasn't like that.

25   Q    Okay.  You expected to request a leave at that

1    Q    Now, after -- strike that.

2         The first time either you or anyone on your

3    behalf asked for a leave of absence was the letter that

4    Attorney Ravel wrote that we marked as Exhibit 6, is that

5    right?

6    A    That's correct.

7    Q    And you were granted that leave of absence,

8    correct?

9    A    That's correct.

10   Q    And you were granted the complete year leave of

11   absence in accordance with the university policy, is that

12   right?

13   A    That's right.

14   Q    You have a claim in this case of a breach of

15   contract, can you tell me what contract was breached and

16   what provision of that contract?

17   A    That's best left to my counsel.

18   Q    Okay.  Unfortunately, I'm not allowed to

19   question your counsel, I'm limited.

20        Do you know of any breach of contract?

21   A    At this time, I can't answer affirmatively.

22   Q    In Attorney Ravel's letter, which we marked as

23   Exhibit 6, she makes reference to investigating claims of

24   malpractice in connection with the care you got at the

25   Health Plan after your coronary event in November of 1999.

1          A          That's true, yes, yes.

2          Q          And everyone in that room thought it was, these

3    were unusual prescription practices to the point where they

4    shouldn't have occurred, isn't that right?

5          A          That's what they decided.

6          Q          As you think about it today, you would agree

7    that you shouldn't have written those prescriptions that

8    way, correct?

9          A          As I think about it today, I would have written

10   John Bell's prescriptions exactly the same, and I believe I

11   would have written the Maria Mendazabel prescriptions the

12   same way.  In retrospect, that's what we're doing now, I

13   would have been very sure that I add that note to urgent

14   visit, that's it.

15         Q          You would have made sure when you wrote those

16   prescriptions for Maria Mendazabel, if you had to do it over

17   again, that you would have made a note in her chart?

18         A          At the outset.

19         Q          You would have checked her chart to make sure

20   that she wasn't getting the same type of narcotic medication

21   from other doctors, wouldn't you?

22         A          I have said that I trusted her, I wouldn't have

23   thought that she was doing that.  I wouldn't have checked

24   for that reason.

25         Q          But you would have checked the chart, right?  If

                         DEL VECCHIO REPORTING
                            (203) 245-9583