05SEP08 Fessel

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

JON M. FESSEL                 :   No. 3:05CV-1348 (SRU)
                              :   915 Lafayette Boulevard
             vs.              :   Bridgeport, Connecticut
                              :
                              :   September 5, 2008
YALE UNIVERSITY HEALTH SVC,   :
ET AL                         :

- - - - - - - - - - - - - - - x


MOTION HEARING


B E F O R E:

        THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

        FOR THE PLAINTIFF:

                JOHN R. WILLIAMS, ESQ.
                    51 Elm Street, Ste. 409
                    New Haven, Connecticut  06510
                BY:  JOSEPH MERLEY, ESQ.


        FOR THE DEFENDANT:


                DONAHUE, DURHAM & NOONAN
                    Concept Park
                    741 Boston Post Road
                    Guilford, Connecticut  06437
                BY:  PATRICK M. NOONAN, ESQ.


                Susan E. Catucci, RMR
                Official Court Reporter
                915 Lafayette Boulevard
                Bridgeport, Connecticut  06604
                    Tel: (917)703-0761

A                                                              2


1                    (4:00 O'CLOCK, P. M.)

2              THE COURT:  Good afternoon.  We're here for

3      argument of summary judgment in Fessel v. Yale University

4      Health Services and others.  Could I have appearances

                        05SEP08 Fessel

5    please?

6              MR. MERLEY:  Yes, for the plaintiff, Jon Fessel,

7    Joseph Merley, John Williams & Associates.

8              MR. NOONAN:  Good afternoon.  Patrick Noonan

9    representing the defendants.  And with me is my daughter

10   who is a lawyer with us, proud to say, Colleen

11   Noonan-Davis.

12             THE COURT:  Very good, thank you.

13             All right.  I have read through the papers and

14   the record in this case and want to start with some

15   questions.  Mr. Merley, what is the plaintiff's position

16   with respect to the state law claims in Counts Three and

17   Four?

18             MR. MERLEY:  Your Honor, I don't have the

19   complaint right here so I'm not sure --

20             THE COURT:  There was a claim for breach of

21   employment contract and breach of the Covenant of Good

22   Faith and Fair Dealing.  There was no opposition to the

23   summary judgment with respect to those claims and it would

24   appear, therefore, that those claims are being abandoned

25   but I didn't want to assume as much.

A                                                              3

1              MR. MERLEY:  Well, I can certainly see why you

2    would conclude such a thing in the absence of opposition.

3    However, I don't feel I'm in a position to formally

4    withdraw them at this point.  I guess I would just be

5    silent as to those claims at this stage.

6              THE COURT:  Okay.  Mr. Noonan, do you want to be

7    heard on that?

8              MR. NOONAN:  I'm not sure what it is I can say.

9    I put in our brief that they simply haven't met any of the

05SEP08 Fessel

10  requirements of the state law claim for breach of contract

11  and the breach of Covenant of Good Faith and Fair Dealing

12  is dependent upon that claim.  So, if you don't reach as

13  proof the breach of contract, you don't reach as proof the

14  breach of Covenant of Good Faith and Fair Dealing.  And

15  even if they made out a prima facie case, without the

16  opposition I'm not sure how Your Honor could do anything

17  but dismiss those claims.

18       THE COURT:  Well, the question would be whether

19  they should be dismissed with prejudice or --

20       MR. NOONAN:  I would think they would be

21  dismissed with prejudice.  I mean this is -- it's been a

22  long time coming and I would not want to invite someone to

23  file a state claim.  They chose this forum.  It's here.

24  The court has jurisdiction.  I think -- there is no

25  opposition.

A                                                              4

1       If Your Honor could -- if Your Honor looked at

2  it, I think there's a reason why there was no opposition.

3  There is nothing to say in response to this.  There is no

4  evidence of a breach of contract.  The only contract is

5  the employment manual.  The only thing they did was to

6  notify him that he had effectively resigned his job by not

7  coming back within a year.  He admits he didn't come back

8  within a year, and frankly he admits he wasn't capable of

9  working within that year.  There was more than a year

10  and-a-half when, by his own admission, he was able to work

11  again.  I don't understand how he can make out a claim and

12  I don't see any impediment to this court dismissing those

13  claims.

14       THE COURT:  Okay, well, let's turn to the

15  federal claims.  First the ADA claim.  Mr. Merley, is

05SEP08 Fessel

16      there evidence in the record from which a jury could find
17      that Dr. Fessel was able to perform the essential
18      functions of his job either with or without reasonable
19      accommodation?
20              MR. MERLEY:  Your Honor, I believe based on the
21      affidavit that's been submitted, that a jury could find
22      just that, that he -- that the conditions from which he
23      suffered, while at one time debilitating, were such that
24      at a later time he -- with an accommodation he could have
25      resumed.  Based -- I'm basing that on the affidavit.

A                                                                    5

1               THE COURT:  Right, but what accommodation should
2       the employer have made to permit him to come back?
3               MR. MERLEY:  Well, at some point I believe there
4       was a request that he have decreased hours, that he not
5       work nights and weekends.
6               THE COURT:  Didn't he object to that?
7               MR. MERLEY:  Didn't -- the plaintiff object?  My
8       impression was that he had made that request and that as a
9       result of the request, that his pay was also then
10      decreased significantly.
11              THE COURT:  All right.  Well, let's back up and
12      take a look at the affidavit.  You're talking about
13      Dr. Fessel's affidavit?
14              MR. MERLEY:  Yes, correct.
15              THE COURT:  Okay.  I didn't see a mention of any
16      accommodation in that affidavit or any suggestion that at
17      any relevant time he could, he was able to come back and
18      fulfill his job function.
19              Look at paragraph 38, for example.  He's
20      indicating that February 4, 2003, his counsel informed the

05SEP08 Fessel

21  defendant that he'd be on disability leave, which suggests
22  he's not able to do his job, he's going to be on leave
23  because he's disabled from performing his job.
24          MR. MERLEY:  Your Honor, the way I look at this
25  is this.  It's at least conceivable looking at paragraphs

A                                                                          6

1   44 and 45 where in the affidavit he's stating that he was
2   scheduled for reappointment and made efforts to look into
3   the status of the reappointment, I would argue that an
4   inference could be drawn from that that he was indicating
5   his intention to resume that employment.  That's why he's
6   asking about the reappointment itself.  I mean I'll
7   concede he doesn't come out and explicitly say I will be
8   back on such and such a date, et cetera, but I think an
9   inference can be drawn from that statement that he had an
10  intention to resume.
11          THE COURT:  Well, that appears to be a license
12  renewal issue, not a question or an issue about his
13  willingness or desire to actually perform the functions of
14  his position.
15          MR. MERLEY:  But he is speaking about his
16  reappointment.
17          THE COURT:  Right.  Look at the prior paragraph
18  though.  He gets reappointed as a Yale physician every two
19  years, which they are obligated to continue.  That sounds
20  like paperwork to me as opposed to a suggestion that he
21  can actually perform the functions of the job.  And, in
22  fact, in his deposition didn't he admit that he could not
23  perform the functions of his job?
24          MR. MERLEY:  I believe he made a statement to
25  that effect, that he could not during that period of time

A                                                                          7

Page 5

05SEP08 Fessel

1   and he felt that he was disabled.  And again, I'll admit
2   right off the bat that the affidavit is silent as to
3   language such as I'm coming back, I'm now able to -- I'm
4   now able to perform, or words to that effect.
5              THE COURT:  Okay.  As I understand the record,
6   Dr. Fessel never actually indicated to Yale that he wanted
7   or intended to return from the leave of absence, is that
8   correct?
9              MR. MERLEY:  That Dr. Fessel never made any
10  indication --
11             THE COURT:  Never told Yale that he intended or
12  wanted to return from his leave of absence.  He was on a
13  leave of absence beginning in February of '04 and that
14  leave was for a year, as I understand the policies of
15  Yale.  And then it was actually extended for a month and
16  he was contacted, you know, let us know in effect what you
17  want to do and my understanding is that he never told Yale
18  or suggested to Yale that he even wanted to come back to
19  his position.  Am I wrong about that?
20             MR. MERLEY:  I can't -- no, I don't have any
21  documents, letters, anything like that where he
22  memorialized in writing any conversation he had or any
23  official written request to do so, or else I'm sure it
24  would have been submitted.
25             THE COURT:  And there's no affidavit suggesting

A                                                              8

1   that he did that orally.
2              MR. MERLEY:  I don't see any language that --
3   explicit or otherwise like that, Your Honor, no.
4              THE COURT:  Is there -- standing here today, can
5   you suggest an accommodation that Yale should have

05SEP08 Fessel

6    provided that it did not?

7         MR. MERLEY:  I think decreased work hours, maybe

8    to some degree shared case load, which I believe was

9    probably something they could have done, things along

10   those lines certainly would have helped ease the burden.

11        THE COURT:  And is there evidence to support the

12   suggestion that he could have performed at reduced hours?

13        MR. MERLEY:  That he could or --

14        THE COURT:  That he could have -- in other

15   words, is there something in the record, does he have a

16   medical opinion, does he have -- even his own assertion,

17   if only Yale had let me work 20 hours a week I would have

18   been able to do it?

19        MR. MERLEY:  I believe I saw somewhere in the

20   record -- I thought it was an affidavit, maybe I'm

21   wrong -- that he did make such a request, that he needed

22   to work less hours and specified the night hours and the

23   weekend hours as specifically part of the problem.

24        MR. NOONAN:  Do you mind if I address that one,

25   Your Honor?

A                                                         9

1         THE COURT:  Sure.

2         MR. NOONAN:  I don't mean to interrupt, to wreck

3    your train of thought, but on that one what the record

4    reflects is that several years before the events in

5    question after the heart attack, Dr. Fessel asked to be

6    relieved of weekend and call hours and that was

7    accommodated.  And Mr. Merley is right that as a part of

8    that accommodation, they reduced his pay as they did with

9    anyone else who asked for that, to be relieved of those

10   responsibilities.  There was no claim for that as a

11   failure to accommodate and, indeed, the statute of

Page 7

05SEP08 Fessel

12  limitations had run on that by the time this lawsuit was

13  filed.  So the request for reduced hours occurred several

14  years before the events in question and was granted.

15       THE COURT:  Paragraph 18 of the affidavit

16  indicates that "Dr. Fessel's physician advised Yale that

17  Dr. Fessel would no longer be able to work nights or

18  weekends.  In response, Yale significantly reduced his

19  salary and Dr. Fessel protested the decrease in salary to

20  no avail."  You know, that would appear to be beyond the

21  statute of limitations but it doesn't appear to me that

22  Dr. Fessel is happy with the decision apparently made by

23  his own physician and communicated to Yale.

24       MR. NOONAN:  And Dr. Fessel did acknowledge at

25  page 64 of his deposition that he felt he couldn't work

A                                                                    10

1   during that entire period of time that he was out.  He

2   didn't say he couldn't work part time, and of course the

3   2nd Circuit has made it pretty clear that it's not up to

4   the employer to initiate a discussion about an

5   accommodation.  It's up to the employee to identify the

6   disability and to negotiate the decision.  Here,

7   Dr. Fessel didn't do that.  The only accommodation he

8   requested was for the medical leave of absence which was

9   immediately granted.

10       THE COURT:  All right.  Do either of you want to

11  be heard further on the ADA claim?

12       MR. NOONAN:  No, Your Honor.

13       MR. MERLEY:  No, Your Honor.

14       MR. NOONAN:  I think we made our position fairly

15  clear in our papers.

16       THE COURT:  All right.  Mr. Merley?

Page 8

05SEP08 Fessel

17            MR. MERLEY:  No, nothing further, Your Honor.

18            THE COURT:  Okay.  Let's move to the ADEA claim.

19    Mr. Noonan, isn't there sufficient evidence to satisfy a

20    prima facie case of age discrimination here?  That is,

21    Dr. Fessel was over 40, he was qualified, he suffered an

22    adverse employment action in the sense that his employment

23    was terminated and the circumstances surrounding the

24    action give rise to an inference of age discrimination, at

25    least in the sense that there is some evidence of a desire

A                                                                     11

1     to ease Dr. Fessel out of his position.  Isn't that

2     enough?  Aren't those facts enough to satisfy the prima

3     facie case?

4            MR. NOONAN:  I think the only element they've

5     satisfied is that he is a member of a protected class.

6     He's got to prove that he was able to do the job, and by

7     his own admission was not.  Qualification doesn't mean I

8     have an MB, it's I have an MB and I'm able to do the work.

9     He admits he's not.  The record here is very clear on

10    that.  There is -- furthermore, Judge, they didn't kick

11    him out; he asked for the leave.

12            THE COURT:  Right, but eventually --

13            MR. NOONAN:  Eventually.  They didn't kick him

14    out --

15            THE COURT:  They didn't kick him out but they

16    terminated him.

17            MR. NOONAN:  He resigned by virtue of not coming

18    back.

19            THE COURT:  Well, but I have to view the

20    evidence in the light most favorable and to the nonmoving

21    party.

22            MR. NOONAN:  Understood, but there's loads of

                              Page 9

05SEP08 Fessel

23    case law talking about neutral policies.  There is no
24    suggestion that this policy was applied any differently to
25    anyone else.  There's absolutely no hint of that in this

A                                                                    12

1     record.
2              THE COURT:  Right, but doesn't that get to the
3     next step, whether there's a pretextural termination?  In
4     other words, here he has been terminated.  That's an
5     adverse employment action.  He no longer has his job.  The
6     question then, the ultimate question is is the defendant's
7     proffered reason; i.e. we just follow our policies, is
8     this a pretext for age discrimination?
9              MR. NOONAN:  You see -- and maybe we're arguing
10    about angels dancing on the head of a pin -- I guess I
11    would say it doesn't matter to me which way I win, but I
12    have to tell you the way I look at this case.  I don't see
13    how you could ever conclude that as of the time he was
14    terminated, which was 13 months after he asked for the
15    leave -- granting the leave is clearly not an adverse
16    employment action.
17             THE COURT:  Right.
18             MR. NOONAN:  Termination by virtue of his not
19    coming back could be considered so, but at that point in
20    time, by his own admission, he was not able to work.  He
21    was not qualified for the job.  Simply not qualified.  If
22    you can't work, you're not qualified.  So they are not
23    obligated -- how can you say that they are obligated to
24    keep him when he admits he can't work?
25             And it's not -- you know, I could imagine a

A                                                                    13

1     scenario where you say, gee, he can't work then but he's

Page 10

05SEP08 Fessel

2    telling you in three more days he's able to work.  He's

3    going to have surgery, he's going to recover, he could

4    work.  That case might meet the standard.  But he says I

5    couldn't work then and I couldn't work until -- from that

6    point in February up through December.  I just, I just

7    don't see how you could reach a conclusion, any jury could

8    each a conclusion that he was able to work, which I think

9    is part of being qualified.  It isn't simply he's got the

10   the paper qualifications.

11           And I think there's got to be evidence of some

12   type of age bias.  It's not just suspicion.  And it's

13   their burden once we raise it to produce evidence.  What

14   they have referred to in their papers is the complaint

15   allegations.  There was no evidence.  But I'm not sure you

16   need to get there.  I mean the real issue is was he

17   qualified for the job as of the time of his termination

18   and by his own admission and his doctor's report, he was

19   incapable of performing the job.

20           THE COURT:  Okay.  Mr. Merley, do you want to

21   respond to that?

22           MR. MERLEY:  Your Honor, I believe, the way I

23   look at it is that what Mr. Noonan has just laid out goes

24   more to the, the burden on the defendant once it is

25   shifted from the plaintiff.  Once he's made out the prima

A                                                              14

1    facie case, I think that's an issue for the defendant to

2    get into to prove or disprove.  I don't know that that

3    goes to the prima facie case itself and I think that's

4    really what the court at this stage would need to be

5    concerned with.

6           THE COURT:  Well, even if, even if I agree with

7    you that Dr. Fessel makes out a prima facie case, we do

8   have the legitimate nondiscriminatory reason offered by

9   the defense for the ultimate termination at the end of the

10   leave period.  Where is the evidence that would give rise

11   to an inference that the real reason that he wasn't --

12   excuse me, the real reason he wasn't brought back or the

13   real reason why he was terminated was in fact due to age

14   bias?

15          MR. MERLEY:  I think at that point the court

16   looks at the, you know, the totality of the circumstances

17   and when, assuming that the defendant meets their burden

18   to show a legitimate nondiscriminatory reason, then the

19   plaintiff is required to show pretext.  I think when you

20   look at the totality of the circumstances, especially as

21   laid out in the affidavit, that would be enough to give

22   rise to a pretext.

23          THE COURT:  But is it a pretext of age

24   discrimination?  You know, I mean what you've got there is

25   a number of people who are replaced by younger people.  I

A                                                          15

1   mean in part that's not great evidence because that

2   happens all the time in the work place.  As people retire

3   or move on, very often young people are going to replace

4   them and you've got a few examples over 12 years or

5   something, which doesn't suggest that this was a policy

6   that was being implemented in some way at the time that's

7   pertinent to this case.

8          MR. MERLEY:  When you look at things such as the

9   allegation the plaintiff has made that his superior was

10   told to nudge him out or ease him out, and that when that

11   order was refused that that person was fired, I think

12   something like that would be -- would entitle the court to

05SEP08 Fessel

13    make a conclusion that there is some sort of pretext

14    there.

15          THE COURT:  Right, but is it a pretext that they

16    didn't like the way he dresses or a pretext that he

17    doesn't get along with others or a pretext that we're

18    paying too much or -- a pretext for what?  That's the

19    problem.  I don't see evidence that it was a pretext for

20    age discrimination.  You don't have, in other words,

21    anyone saying you're too old, Dr. Fessel, you just can't

22    do your job anymore, or we need somebody younger in this

23    position or any of these types of even stray remarks.

24          MR. MERLEY:  Well, I think that's the kind of

25    smoking gun that the case law says you rarely find in

A                                                               16

1     cases like this and that's why you look at all the

2     circumstances that give rise to it, the whole history

3     leading up to -- you don't see comments like that, either

4     written or verbal, usually.

5          But I'm aware of the point the court is making

6     on this issue.  I still believe that based on everything

7     he's alleged as far as age and replacement of others by

8     younger people, that is enough for the court to make that

9     conclusion that this was a pretext.  Again, that's the way

10    I'm seeing it.  I think a jury could too.

11          THE COURT:  All right.  Do either of you want to

12    be heard further on the age claim?

13          MR. NOONAN:  Just very briefly, Your Honor, on

14    that last point.  I think at this point it's really not

15    for the jury, it's for the court, and that the 2nd Circuit

16    has clearly held that where there is an age neutral policy

17    that is being applied, as this one clearly is, the

18    plaintiff has to produce substantial evidence of a pretext

05SEP08 Fessel

19    and there simply isn't any in this case.  What Attorney

20    Merley is talking about with regard to the superior being

21    told to ease him out, there's no evidence of that.

22    There's an allegation but there was -- it was not based on

23    personal knowledge.  Dr. Fessel makes an allegation but he

24    didn't prove it.  There's nothing in his affidavit based

25    on his personal knowledge --

A                                                              17

1          THE COURT:  Don't we have a letter from the

2     doctor who related that statement?  Which admittedly might

3     not be admissible in its current form, but that doctor

4     could be called to testify, so we do have it in written

5     form.

6          MR. NOONAN:  Well, it's clearly not admissible

7     in response to the motion for summary judgment.

8          THE COURT:  My understanding of the response to

9     summary judgment, we actually have to have admissible

10    evidence, there's a fair amount of case law on that, or

11    evidence in a form that would be admissible at trial.  Why

12    couldn't they call the doctor to testify at trial?

13         MR. NOONAN:  Well, they might be able to do that

14    but first you've got to qualify the document.  You've got

15    to get the doctor who allegedly wrote it to say this is my

16    letter, here's -- at least to do that.  In its present

17    form there's no authentication of it.  But beyond that --

18    and I do think that's a big for problem for them.  But

19    beyond that, there's no suggestion that he was told to

20    ease him out because of his age.

21         THE COURT:  Right, that's a --

22         MR. NOONAN:  Assuming that, and then you have

23    the age neutral policy and there's a fair number of 2nd

Page 14

05SEP08 Fessel
24    Circuit cases on that, and I think the 2nd Circuit is
25    looking for, as they say, substantial evidence, not thin
A                                                                    18

1    theory based on an allegation but real evidence of some
2    evidence that this is pretextural.  There's no suggestion
3    at all that the University was trying to prevent him from
4    coming back.  Indeed, they wrote him two letters to remind
5    him that his leave was expiring, which would seem to me
6    that is the antithesis of someone wanting to weed someone
7    out; if you wanted his leave to terminate his employment,
8    you wouldn't remind him that it's expiring and if you want
9    to come back, you have to do so by a certain date.
10   Similarly, if you're trying somehow to retaliate against
11   him because of his age, you wouldn't give him an extra
12   month you've never given to anybody else in order to let
13   him get his disability benefits.  There's simply no
14   evidence that anybody else got a better deal than he got.
15   Everybody gets treated the same.  I don't know how they
16   made out a prima facie case, but if they did, there
17   certainly is no evidence of a pretext.
18            THE COURT:  Okay.  All right.  Anything further
19   from either of you?
20            MR. NOONAN:  Not from me, Your Honor.
21            MR. MERLEY:  No, Your Honor.
22            THE COURT:  Okay.  I'm going to rule on the
23   motion for summary judgment at this time rather than
24   writing an opinion.  I'll try and state my reasons for the
25   ruling now but if either of you have questions or want to
A                                                                    19

1    have the ruling amplified, clarified in any way today,
2    please let me know when I'm done and I'll try and
3    accomplish that.
                              Page 15

05SEP08 Fessel

4            The summary judgment standard is well known and
5    I'm not going to repeat it at any length here today.   In
6    summary, I have to view the record evidence in the light
7    most favorable to the nonmoving party and draw all
8    reasonable inferences in favor of the nonmoving party and
9    decide whether any reasonable jury looking at the evidence
10   in that light could rule in favor of the nonmoving party
11   on any issue or any claim.
12            The purpose of summary judgment is to decide
13   whether there are genuine issues of material fact that
14   need to be resolved by the jury or, instead, if one party
15   is entitled to a judgment as a matter of law.
16            Let me start with the state law claims in Counts
17   Three and Four.  That's the breach of employment contract
18   and breach of Covenant of Good Faith and Fair Dealing.
19   Summary judgment should enter in favor of the defendants
20   on those claims because they have been abandoned here.
21   There has been no opposition to the summary judgment
22   motion with respect to those claims.  "There is at least
23   district court case law that suggests the federal courts
24   may deem a claim abandoned when a party moves to have
25   summary judgment on one count and the party opposing

A                                                              20

1    summary judgment fails to address the argument in any
2    way."  That's a quote from Taylor v. the City of New York,
3    269 FSupp 2d 68 at 75, a case out of the Eastern District
4    of New York.
5            But a similar rule is followed by the 2nd
6    Circuit itself on appeals.  When an issue is not briefed
7    on appeal, it's deemed abandoned and the 2nd Circuit
8    routinely grants judgment on such issues for failure to

05SEP08 Fessel

9   brief them.  And here, there really is no argument that

10  summary judgment should not enter on the state law claims

11  and, accordingly, it will.

12       Turning to the disability discrimination claim,

13  this is subject, as is the age claim, to the burden

14  shifting analysis under the -- oh my gosh --

15       MR. NOONAN:  McDonnell Douglas.

16       THE COURT:  I was completely blanking, I must

17  have said this a thousand times.  Lost the case.  Thank

18  you.

19       McDonnell Douglas burden shifting analysis,

20  where in essence the plaintiff is required to make out a

21  prima facie case which then obligates the defense to come

22  forward with a legitimate discriminatory reason for the

23  employment action, which then imposes once again the

24  burden on the plaintiff to come forward with evidence from

25  which a reasonable jury could find that the reason given

A                                                        21

1   is merely a pretext for discrimination.

2        And turning first to the question of whether a

3   prima facie case of disability discrimination has been

4   made out, the elements of a prima facie case under the ADA

5   are, one, that the employer is subject to the statute

6   under which the claim is brought; two, that he's an

7   individual with a disability within the meaning of the

8   statute in question; three, that with or without

9   reasonable accommodation, he could perform the essential

10  functions of the job, and; four, that the employer had

11  notice of the plaintiff's disability and failed to provide

12  such accommodation.

13       Here, the first two elements in effect are

14  conceded and the question becomes whether Dr. Fessel could

Page 17

05SEP08 Fessel

15    perform the essential functions of his job and, if so,
16    whether the defendants failed to provide a reasonable
17    accommodation.  Here, the undisputed evidence is that
18    Dr. Fessel could not perform the essential functions of
19    his job with or without reasonable accommodation.  He
20    admitted as much directly in his deposition.  There's no
21    evidence suggesting otherwise in the form of medical
22    testimony or even an assertion by the plaintiff himself
23    that he felt he could perform his job.  Certainly the
24    circumstances suggest that he didn't think he could
25    perform his job because he did not return or seek to

A                                                                          22

1    return from the leave of absence granted to him as a
2    result of his disability.  And, accordingly, there is
3    simply no evidence from which a reasonable jury could find
4    that he was capable of performing his job.
5              In any event, even if I'm wrong about that,
6    there is no evidence that the defendants refused or failed
7    to provide any reasonable accommodation after being put on
8    notice of the need for one.  Here, as soon as Yale was
9    notified of the disability, they immediately in effect
10    withdrew disciplinary action and permitted Dr. Fessel to
11    go on a leave of absence.  As that leave was expiring they
12    extended it for a month and never heard from him.  Despite
13    requests, they never heard from him that he intended to or
14    wanted to return to work.
15              To the extent that there's any suggestion that
16    Yale was obligated under cases such as Brady v. Walmart,
17    531 F3d 127, to the extent that there's a suggestion that
18    Yale was obligated to engage in an interactive process
19    with Dr. Fessel, the evidence is clear that in fact it

Page 18

05SEP08 Fessel
20    did, once informed of the disability, as I mentioned a
21    moment ago, the first course and they provided the
22    requested leave.  At that point Dr. Fessel was never
23    again in a position where Yale was able to determine what,
24    if any, accommodation would have been -- would have
25    enabled Dr. Fessel to perform his job.  And certainly the

A                                                                    23

1    doctor never provided any information to Yale on that
2    topic.  So, to the extent that an interactive process was
3    required, the only evidence here is that it was engaged
4    in.
5            In short, Dr. Fessel has not made out a prima
6    facie case that he was the victim of discrimination under
7    the ADA and, accordingly, summary judgment on that claim
8    will enter in favor of defendants.
9            Turning to the age discrimination claim, once
10    again we have the McDonnell Douglas burden shifting
11    process and the prima facie case for an ADEA claim is that
12    plaintiff is a member of a protected class; he's qualified
13    for his position; he suffered an adverse employment action
14    and; the circumstances surrounding that action gave rise
15    to an inference of age discrimination.
16            Here, again, the problem is whether Dr. Fessel
17    is qualified for his position.  As mentioned in argument,
18    he has to be able to perform his job in order to be
19    qualified.  He has again admitted that he can't perform
20    his job or couldn't at the relevant time and, therefore,
21    it appears that he did not make out a prima facie case.
22            Even if he were deemed qualified for his
23    position and even though his eventual termination would
24    suffice as an adverse employment action, it's difficult to
25    see the circumstances surrounding the action give rise to

A                                                                                          24

1    an inference of age discrimination.

2          Again, even assuming that that hurdle could be

3    cleared, there is a legitimate nondiscriminatory reason

4    for the termination that's been provided; that is, that

5    Yale's policies were you have a one year leave of absence

6    and must come back at that time or the employment would be

7    terminated.  Here, that time ran without Dr. Fessel

8    requesting a return.  In fact, the time was extended for a

9    month and he still didn't request a return.  Because the

10   age neutral policy was applied to him, it appears that

11   there is a legitimate nondiscriminatory reason for his

12   termination.

13         Even taking all the circumstances in their

14   totality, I don't find that there is sufficient evidence

15   for a jury, again assuming that the plaintiff could

16   overcome the prima facie case, which I don't believe he

17   can, it does not appear that there is evidence from which

18   a jury could find that the real reason for his termination

19   was an age discriminatory reason.

20         It seems to me the pertinent evidence here on

21   the plaintiff's behalf is the evidence that Dr., I believe

22   it's Dr. Malik, was urged to ease Dr. Fessel out of his

23   position and that he failed to do so and was later himself

24   terminated, as well as some evidence going back to 1990

25   that when individuals employed by Yale left Yale's employ,

A                                                                                          25

1    they were replaced by younger workers.  I would note that

2    merely being replaced by a younger worker is not evidence

3    of a discriminatory intent on the part of the employer.

4          For example, in paragraph 12 of Dr. Fessel's

05SEP08 Fessel

5    affidavit, there's an indication in 1990 Dr. Frederico

6    left Yale and was replaced by someone younger, someone

7    under 40.  There's nothing about that circumstance that

8    suggests an age discriminatory bias on the part of Yale.

9    Someone over 40 left; they happened to be replaced by

10   someone under 40.  Instead, there's a potentially age

11   discriminatory inference that can arise when Yale

12   terminates the employment of someone over 40 and replaces

13   them with a younger worker.  There is that suggestion in

14   paragraph 13, in 1991 the plaintiff himself was replaced

15   with a younger physician, but I believe that is the only

16   incident or evidence of a person actually being replaced

17   by the decision of Yale as opposed to their own volition

18   in leaving the employ that's been brought forward by the

19   plaintiff, and that is not sufficient even in combination

20   with the evidence that Yale sought to ease Fessel out of

21   his position.  The combination is not sufficient to give

22   rise to a reasonable inference that Yale was not merely

23   applying its neutral policy but was, instead, intending to

24   discriminate against Dr. Fessel on the basis of his age.

25          So, again, on the age discrimination claim, I'm

A                                                              26

1    going to enter summary judgment in favor of the

2    defendants.

3          Because summary judgment enters in favor of the

4    defendants on all of the claims, the case will be

5    dismissed and the file will be closed.

6          Let me give each of you a chance to request any

7    clarification or amplification of that decision at this

8    time.

9          MR. MERLEY:  No, nothing from the plaintiff,

10   Your Honor.

                         05SEP08 Fessel
11              MR. NOONAN:  None from the defendant, Your
12      Honor.
13              THE COURT:  Thank you both.  We'll stand in
14      recess.
15              MR. NOONAN:  Thank you.
16              (Whereupon the above matter was adjourned at 4:50
17      o'clock, p. m.)
18
19
20
21
22
23
24
25
A                                                              27




                     C E R T I F I C A T E




            I, Susan E. Catucci, RMR, Official Court
     Reporter for the United States District Court for the
     District of Connecticut, do hereby certify that the
     foregoing pages are a true and accurate transcription of
     my shorthand notes taken in the aforementioned matter to
     the best of my skill and ability.




                          Page 22

05SEP08 Fessel

/S/_Susan E. Catucci_

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761

A